UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                             )
ELIZABETH CORTES-VAZQUES,      )
                                             )
        Plaintiff,                       )
                                             )
            v.                           )      Civil Action No. 10-11092-JLT
                                             )
MICHAEL ASTRUE,                  )
Commissioner of Social Security,     )
                                             )
        Defendant.                     )
_____)

REPORT AND RECOMMENDATION ON DEFENDANT'S
<u>MOTION TO AFFIRM THE COMMISSIONER'S DECISION</u>

[Docket No. 11]

July 21, 2011

Boal, M.J.

      This is an action for judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") regarding an individual's entitlement to Social Security Disability Insurance ("SSDI") benefits and Supplemental Security Income ("SSI") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Elizabeth Cortes-Vazques ("Plaintiff") asserts that the Commissioner's decision denying her such benefits – memorialized in a January 25, 2010 decision of an administrative law judge ("ALJ") – is in error, [Docket No. 9], and the Commissioner, in turn, has moved to affirm [Docket No. 11].[1] This Court heard oral argument on the motion on July 12, 2011. For the reasons contained herein, I recommend that the district

---

[1] The parties' motions have been referred to this Court for a report and recommendation. [Docket No. 13].

court remand the case for reconsideration in light of Johnson v. Astrue, 597 F.3d 409 (1st Cir. 2009).

I.     **STANDARD OF REVIEW**

A court may not disturb the Commissioner's decision if it is grounded in substantial evidence. See 42 U.S.C. §§ 405(g) and 1383(c)(3). Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion. Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981). The Supreme Court has defined substantial evidence as "more than a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971). Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion." Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (citation and internal quotation marks omitted).

The resolution of conflicts in evidence and the determination of credibility are for the Commissioner, not for doctors or the courts. Rodriguez, 647 F.2d at 222; Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 141 (1st Cir. 1987). A denial of benefits, however, will not be upheld if there has been an error of law in the evaluation of a particular claim. See Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996). In the end, the court maintains the power, in appropriate circumstances, "to enter . . . a judgment affirming, modifying, or reversing the [Commissioner's] decision" or to "remand [ ] the cause for a rehearing." 42 U.S.C. § 405(g).

## II. FACTS AND PROCEDURAL HISTORY

### A. Procedural History

Plaintiff filed applications for SSDI and SSI on March 28, 2008, alleging an inability to work since October 1, 2006 due to depression, anxiety, anemia, a hysterectomy, lupus, and cholesterol. (Administrative Record ("AR") 48, 153-154, 157-163, 182) [Docket No. 8]. Plaintiff's date last insured was June 30, 2008. (AR 49). Plaintiff's applications were denied initially (AR 65-79), and upon reconsideration. (AR 85-94). On November 2, 2009, ALJ Margaret Donaghy held a hearing at which Plaintiff was represented by counsel. (AR 4). The ALJ heard testimony from Plaintiff and a vocational expert ("VE"). (AR 4-37). On January 25, 2010, the ALJ issued her opinion, finding Plaintiff not disabled from October 1, 2006, through January 25, 2010. (AR 42-59).

Plaintiff's case was selected for review by the Decision Review Board ("DRB"). (AR 42). By letter dated April 28, 2010, the DRB notified Plaintiff that it had not completed its review during the required period, and thus the ALJ's decision became the final decision of the Commissioner. (AR 1-3). Plaintiff filed this action on June 28, 2010. [Docket No. 1].

### B. Background

Plaintiff was born in 1970 and was 36 years old on the onset date of her alleged disability. (AR 153, 178). Plaintiff has completed two years of college. (AR 188). She has worked as a secretary and a medical assembler/packer. (AR 183). She lives in a second-floor apartment with her two children, who were ages 13 and 15 at the time of the hearing. (AR 1, 14).

C. <u>The Medical Evidence</u>[2]

On January 16, 2007, Plaintiff told Peter Roman, M.D., an orthopedist, that she had experienced pain in both hands for two months. (AR 237). Dr. Roman observed that Plaintiff had full range of motion with no deformities; she tolerated neck motion well; she had full motion in her forearm, wrist, and elbow; and there was no evidence of osteoarthritis. <u>Id.</u> Dr. Roman further found that Plaintiff's Tinel's, Phalen's, Finkelstein, and grind test at the base of her thumbs were negative.[3] <u>Id.</u> Dr. Roman concluded that Plaintiff's examination was normal and that could work in her current capacity. <u>Id.</u>

On July 24, 2007, Plaintiff had a right wrist x-ray, which was normal. (AR 287). Three weeks later, Dr. Roman noted that Plaintiff had developed classic symptoms of de Quervain's tenosynovitis[4] in her right hand and wrist. (AR 236). Dr. Roman found that, while Plaintiff's Finkelstein test was positive in her right wrist and she had swelling and tenderness in her first dorsal compartment, her Tinel's and Phalen's tests were negative and she had full range of motion in her hand without findings of arthritis. <u>Id.</u> Dr. Roman recommended a first dorsal compartment surgical release (AR 236), which was conducted on August 16, 2007. (AR 506-8).

---

[2] The Court will discuss only the medical evidence concerning Plaintiff's physical impairments because Plaintiff did not challenge in her memoranda the ALJ's findings concerning the severity of her mental impairments or the scope of her mental RFC. <u>See</u> Docket Nos. 9, 14.

[3] Tinel's sign and Phalen's maneuver are commonly used to detect carpal tunnel syndrome. Finkelstein's test is used to diagnose de Quervain's tenosynovitis in people with wrist pain. The grind test is used to distinguish between de Quervain's tenosynovitis and degenerative arthritis. Memorandum of Law in Support of Defendant's Motion to Affirm the Commissioner's Decision, p. 5, n. 7.

[4] De Quervain tenosynovitis is an inflammation of the first dorsal compartment of the wrist. <u>Stedman's Medical Dictionary</u>,(27th ed. 2000), available on Westlaw at STEDMANS 402790.

Eleven days later, Dr. Roman observed that Plaintiff's range of motion was excellent; she had very little swelling; her symptoms were much improved; and she had full range of motion at the base of her thumb. (AR 235). Dr. Roman concluded that Plaintiff could follow up with him as needed. Id.

On October 17, 2007, Joel Epstein, M.D., a rheumatologist, examined Plaintiff. (AR 265-66). Plaintiff stated that she had occasional muscle and joint pain that had gotten worse over the past year and that she consistently experienced soreness in her hands, shoulders, knees and ankles. (AR 266). Dr. Epstein found that Plaintiff's right wrist was tender; she had pain with forty-five degrees of flexion; and there were tender points observed throughout the examination. Id. She had no diffuse swelling in her right wrist and had full range of motion without warmth or swelling in her other joints. Id. Dr. Epstein noted that her history and exam "was more consistent with fibromyalgia than a systemic disease." Id. Dr. Epstein concluded that if Plaintiff was still having significant difficulty over the next three to six months, she could return for further evaluation. Id.

On October 18, 2007, Dr. James Kuin of the University of Massachusetts Medical Center, Disability Evaluation Services examined Plaintiff. (AR 244). Plaintiff complained to Dr. Kuin about diffuse body pains as well as muscle and bone aches. (AR 245). Plaintiff denied any significant morning stiffness associated with her joint pain; she denied suffering from any extra-articular complications due to her "presumed arthritis"; and she was not under any treatment for her diffuse joint pain. Id. Plaintiff told Dr. Kuin that she had no trouble with self-care and she could drive a car; shop on her own; walk for five to ten minutes each morning for exercise; and perform most housework as long as she could take frequent breaks. Id. Dr. Kuin

found that Plaintiff had no focal neurological deficits; her gait and coordination were normal; there was no sign of acute inflammation or deformities in her joints; she was not tender to palpation; and she had normal range of motion in her elbows, wrists, hands, fingers, knees, and ankles. (AR 246). Dr. Kuin determined that Plaintiff's examination failed to reveal any significant findings. Id. On November 9, 2007, Disability Evaluation Services concluded on behalf of the Massachusetts Department of Transitional Assistance that Plaintiff was not disabled. (AR 231).

On January 31, 2008, Plaintiff began seeing Rajaa Nahra, M.D., an internist, and continued to receive treatment from Dr. Nahra from February 12, 2008 to October 7, 2009. (AR 522-28, 575-79). Dr. Nahra observed that Plaintiff was in no acute distress; her sensory and motor examinations were normal; and she had no joint effusion. (AR 415-16).

On May 20, 2008, Beth Schaff, M.D., a state agency physician, reviewed Plaintiff's records on behalf of the Social Security Administration. (AR 445- 452). Dr. Schaff concluded that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and sit and stand/walk for about six hours each in an eight-hour day. (AR 446). Dr. Schaff also determined that Plaintiff could only occasionally engage in postural maneuvers and was limited to occasional right grasping and twisting. (AR 447-48).

On September 30, 2008, Jane Matthews, M.D., a state agency physician, reviewed Plaintiff's records on behalf of the Social Security Administration. (AR 470-477). Dr. Matthews concluded that Plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, and sit and stand/walk for about six hours each in an eight-hour day. (AR 471). Dr. Matthews found that Plaintiff was restricted to occasional postural maneuvers except for

6

frequent balancing, and was limited to occasional grasping and twisting with her right upper arm. (AR 472-73).

On October 10, 2008, Dr. Nahra found that Plaintiff was positive for tender points in 12 symmetric areas and that her diagnosis was "likely fibromyalgia." (AR 523). On November 10, 2008, Dr. Nahra noted that Plaintiff continued to have aches and pains and that her diagnosis was fibromyalgia. (AR 522).

On January 2, 2009, Dr. Epstein found that Plaintiff's right wrist was tender without swelling, and she had tender points in her hands, wrists, elbows, shoulders, hips, neck, and knees. (AR 544). Dr. Epstein noted that his impression was that Plaintiff had wrist tendinitis and fibromyalgia that was only obtaining a slight benefit from naproxen. (AR 594). On March 20, 2009, Dr. Epstein observed that although Plaintiff's right wrist was very tender and she had trigger points all over, there was no synovitis.[5] (AR 545).

On May 6, 2009, Dr. Epstein noted that Plaintiff's wrist and physical examination findings were the same, she had not gone back to Dr. Roman and "Gabap [gabapentin, *i.e.*, Neurontin, a pain medication] helps." (AR 545).

On September 8, 2009, Dr. Epstein noted that Plaintiff had been experiencing an increase of pain in her hands, elbows, writs, knees and ankles for the past few weeks. (AR 543). Dr. Epstein observed that Plaintiff was tender in her MCP's (*i.e.*, metacarpophalangeal joints of the fingers), wrists, and ankles. There was no evidence of synovitis and her knee range of motion was full. Id.

---

[5] Synovitis is an inflammation of a synovial membrane, especially that of a joint. Without qualification, synovitis is equivalent to arthritis. Stedman's Medical Dictionary, (27th ed. 2000) available on Westlaw at STEDMANS 397520.

On October 9, 2009, Dr. Epstein noted that Plaintiff had very tender triggers and "pain all over," there was no synovitis and Cyclobenz (a muscle relaxant) was slightly helpful. (AR 556). That same day, Dr. Epstein completed a Physical RFC Questionnaire. (AR 552-55). In that assessment, he concluded that Plaintiff could walk only two city blocks, and could sit and stand/walk for less than two hours each in an eight-hour day. (AR 553). Dr. Epstein also opined that Plaintiff needed to take a walk every twenty minutes for five minutes, shift positions at will, and take ten unscheduled breaks a day. (AR 553-54). Dr. Epstein further found that Plaintiff could use her hands to grasp, turn, twist objects 5% out of an eight-hour day, use her arms to reach only 5% out of an eight-hour day, and she could rarely twist, stoop, climb, crouch/squat, lift less than ten pounds, look up or down, turn her neck, or hold her head in a static position. (AR 554-55). Dr. Epstein added that Plaintiff was capable of low stress jobs; that her pain constantly interfered with her attention and concentration; and that she would miss more than four days of work a month. (AR 553, 555).

D.  Plaintiff's Activities of Daily Living

Plaintiff told Dr. Kuin on October 18, 2007 that she had no trouble with self-care and that she could drive, shop on her own, do most housework with frequent breaks, and walk for five to ten minutes every morning to get exercise. (AR 244-45). Plaintiff told David Husson, Psy.D. on October 24, 2007 that she was able to attend to her own grooming, get her children ready for school, sweep and vacuum for a half an hour a day, do laundry as needed, check her email, cook for herself and her children, try to help her children with their homework, visit her mother regularly, write checks, and use public transportation. (AR 248-50).

Plaintiff testified at the hearing on November 2, 2009 that she reads in Spanish, watches

8

entertainment shows, cooks for herself and her children, and performs household chores with help from her children. (AR 20- 21). Plaintiff testified that she needs assistance from someone when she is shopping because she is unable to carry many items. (AR 19). She testified that she has trouble carrying a gallon of milk and that she places her coffee cup on a table because she cannot hold it for the entire time she is drinking. (AR 20, 24). Plaintiff testified that she had difficulty with a hair brush and needed to use both hands. (AR 26). Plaintiff testified that she does her household chores "very calm and very slowly" to avoid pain. (AR 22). Plaintiff testified that approximately twice a month she has pain that lasts for two consecutive days and that on those days she cannot bathe or get dressed. (AR 22-23). Plaintiff stated that she is able to use public transportation to attend appointments without a problem. (AR 22). She has a license and said that if she had a car she would be able to drive it, but "[n]ot to drive that long and not too far." Id.

## III. DISCUSSION

An individual is entitled to SSDI benefits if, among other things, she has an insured status and, prior to its expiration, is disabled. See 42 U.S.C. § 423(a)(1)(A) and (E). Entitlement to SSI, on the other hand, requires a showing of both disability and financial need. See 42 U.S.C. § 1381a. Plaintiff's need, for purposes of SSI, and her insured status, for purposes of SSDI, are not challenged.

### A. Disability Standard and the ALJ's Decision

The Social Security Act (the "Act") defines disability, in part, as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. § 423(d)(1)(A). See also 42 U.S.C. § 1382c(a)(3)(A) (similar). An individual is considered disabled under the Act

> only if his physical and mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See generally Bowen v. Yuckert, 482 U.S. 137, 146-49 (1987).

In determining disability, the Commissioner follows the five-step protocol described by the First Circuit as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a severe impairment? A "severe impairment" means an impairment "which significantly limits the claimant's physical or mental capacity to perform basic work-related functions." If he does not have an impairment of at least this degree of severity, he is automatically not disabled.
>
> Third, does the claimant have an impairment equivalent to a specific list of impairments in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.
>
> . . . .
>
> Fourth . . . does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.
>
> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so he is disabled; if not he is not disabled.

Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

In the instant case, the ALJ found as follows with respect to these questions: Plaintiff had not engaged in substantial gainful activity since the alleged onset of her disability (question 1);

10

she had impairments which were "severe," namely, fibromyalgia, right wrist pain, status post de Quervain's tenosynovitis release, and depressive and anxiety disorders, but those impairments did not meet or medically equal one of the listed impairments in Appendix 1 (questions 2 and 3); Plaintiff was prevented from performing her past relevant work as a medical assembler and secretary (question 4); but Plaintiff had the residual function capacity ("RFC") to perform a significant number of jobs in the national economy (question 5). Accordingly, the ALJ concluded that Plaintiff did not suffer from a disability. (AR at 50-59.)

B.  Plaintiff's Challenge to the ALJ's Decision

Plaintiff argues that (1) the ALJ erred in giving "little weight" to Dr. Epstein's opinion regarding her RFC as a result of her fibromyalgia in favor of those submitted by Drs. Schaff and Matthews and that consequently the VE's assessment was faulty, (2) the ALJ erred in not crediting Plaintiff's subjective complaints of pain and limitations regarding her fibromyalgia, and, (3) the ALJ erred by not re-contacting Dr. Epstein to resolve alleged inconsistencies in the record.

1.  *Fibromyalgia*

Plaintiff was diagnosed with fibromyalgia. (AR 55, 522-23, 594). Fibromyalgia is defined as "[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause." Johnson v. Astrue, 597 F.3d 409, 410 (1st Cir. 2009), quoting Stedman's Medical Dictionary, at 671 (27th ed. 2000). Musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities. Id., quoting Harrison's Principles of Internal Medicine, at 2056 (16th ed. 2005). The American College of Rheumatology has established diagnostic criteria that include "pain on both sides of the body, both above and below the waist,

[and] point tenderness in at least 11 of 18 specified sites." Id., quoting Stedman's Medical Dictionary at 671. "[F]ibromyalgia is a disabling impairment and ... there are no objective tests which can conclusively confirm the disease." Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003) (internal quotations and citations omitted). "[I]n stark contrast to the unremitting pain of which [fibromyalgia] patients complain, physical examinations will usually yield normal results – a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." Id.

2. *Weight Afforded to Medical Opinions*

Plaintiff argues that the ALJ committed reversible error by giving considerable weight to the RFC opinions of Drs. Schaffer and Matthews, two non-examining physicians, and not to the RFC of Dr. Epstein, her treating rheumatologist. Plaintiff's Brief ("Pl.'s Br.") 8-14 [Docket No. 9]. This Court agrees.

Although not required to do so, see Arroyo v. Sec'y of HHS, 932 F.2d 82, 89 (1st Cir. 1991), an ALJ should give "more weight to the opinions from the claimant's treating physicians, because these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairments." 20 C.F.R. § 404.1527(d)(2). A treating source's opinion is entitled to controlling weight when it is well supported by medically acceptable clinical and laboratory diagnostic techniques. Id.; Social Security Ruling ("SSR") 96-2p, 1996 SSR LEXIS 9.

In Johnson v. Astrue, the First Circuit reviewed an ALJ's decision in a fibromyalgia case that disregarded an examining physician's RFC because of a lack of objective evidence. 597 F.3d 409, 410 (1st Cir. 2009). The First Circuit found that the ALJ erred because a lack of

objective findings is expected in fibromyalgia cases and that requiring more would be "requiring objective evidence beyond the clinical findings necessary for a diagnosis of fibromyalgia under established medical guidelines." Id., 597 F.3d at 412-413, quoting Green-Younger, 335 F.3d at 106-7. The First Circuit also found that the ALJ's decision not to credit the claimant's allegations of disabling pain based on her daily activities was not supported by substantial evidence because none of the claimant's physicians had discredited her complaints of pain. Id. at 414.

The ALJ here committed essentially the same error as the ALJ in Johnson. Specifically, the ALJ gave "little weight" to the opinion of Dr. Epstein because she found that it was "inconsistent in severity with normal diagnostic imaging and the objective findings from treating and examining sources … showing tender points and some continued right wrist pain but otherwise unremarkable findings." (AR 56). Under Johnson, this is error.

In the same vein, it was error for the ALJ to have afforded greater weight to the RFCs of the two non-examining physicians, Drs. Schaff and Matthews. The amount of weight that can properly be given to the conclusions of non-testifying, non-examining physicians "will vary with the circumstances, including the nature of the illness and the information provided the expert." Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994) (internal quotation marks and citation omitted). The ALJ stated that she gave "considerable weight" to their opinions because they "are generally consistent in severity with normal diagnostic imaging." (AR 56). However, it is inconsistent with Johnson for the ALJ to evaluate Plaintiff's condition by relying on diagnostic imaging.

In addition, both Dr. Schaff and Dr. Matthew's RFCs predated Plaintiff's diagnosis of fibromyalgia. It was therefore error for the ALJ to have assumed that their assessments would

13

remain unchanged after becoming aware of that diagnosis. Kelly v. Astrue, No. 09-78-B-W, 2009 U.S. Dist. LEXIS 92259, * 14 (D. Me. September 28, 2009). Further, as non-examining physicians, Drs. Matthews and Schaff were "deprived of hearing first hand plaintiff's self-reports of pain, an essential diagnostic tool in fibromyalgia cases" and "could not make [their] own independent observations of Plaintiff's mobility or immobility." Strother v. Astrue, No. 09-30122, 2011 U.S. Dist. LEXIS 21052, * 19-20 (D. Mass. March 2, 2011).

Dr. Epstein's assessment was central to Plaintiff's claim. Given that the ALJ articulated a legally infirm basis for both rejecting his opinion and giving substantial weight to the non-examining physicians, the Commissioner's decision must be reversed and remanded for reconsideration in light of Johnson.

   3. *Subjective Complaints of Pain and Limitations*

Plaintiff argues that the ALJ erred in not crediting her subjective complaints of pain and limitations and failed to consider the factors listed in Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986) in evaluating her complaints. (Pl.'s Br. 14-20).

    a. Avery Factors

In determining a claimant's RFC, an ALJ must consider a claimant's subjective allegations of pain and functional limitations, but she is not required to take those allegations at face value and may reject them where they are unsupported by the medical evidence, treatment history, and activities of daily living. See Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 194-95 (1st Cir. 1987); Avery v. Sec'y of Health & Human Servs., 797 F.2d at 22-23; Winn v. Heckler, 762 F.2d 180, 181 (1st Cir. 1985); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p, 1996 SSR LEXIS 4. Specifically, the ALJ must consider the so-called "Avery factors,"

which are the claimant's daily activities, functional restrictions, non-medical treatment, medications and side-effects, precipitating and aggravating factors, and the nature, location, onset, duration, frequency, radiation, and intensity of the pain. Avery, 797 F.3d at 29. If an ALJ determines that a claimant's testimony is not credible, the judge "must make specific findings as to the relevant evidence he considered in determining to disbelieve the [claimant]." Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986); see also Larlee v. Astrue, 694 F. Supp. 2d 80, 85 (D. Mass. 2010). An ALJ is not required to discuss each of the Avery factors in order to sufficiently support a credibility determination. See, e.g., Foley v. Astrue, No. 09-10864, 2010 U.S. Dist. LEXIS 60174, * 21 (D. Mass. June 17, 2010).

In this case, the ALJ complied with Avery because she questioned Plaintiff regarding her daily activities (AR 20-22); the nature, duration, and frequency of her symptoms (AR 16, 24); her functional limitations (AR 14, 19-20, 23-24); the side effects of her medications (AR 12, 16-19) and her medical treatment. (AR 17-18). However, as discussed below, her determination regarding Plaintiff's subjective claims of pain must be reconsidered on remand.

      b.     ALJ's Finding Regarding Plaintiff's Complaints

The ALJ did not find Plaintiff's subjective claims of pain credible because "diagnostic imaging and treating and examining source objective findings have been normal." (AR 55). In addition to a lack of objective evidence, the ALJ also found that Plaintiff's activities of daily living, i.e., her performance of personal care activities, household chores, and taking care of her children, did not support her subjective allegations of disabling pain and physical symptoms. (AR 57).

However, the First Circuit held in Johnson that once an ALJ accepts a diagnosis of

15

fibromyalgia, she "*ha[s] no choice* but to conclude that the claimant suffered from the symptoms usually associated with such condition, unless there was substantial evidence in the record to support a finding that claimant did not endure a particular symptom or symptoms." Johnson, 597 F.3d at 414. "The primary symptom of fibromyalgia, of course, is chronic widespread pain." Id.

The Commissioner argued at the hearing before this Court that the ALJ complied with Johnson because she accepted Plaintiff's diagnosis of fibromyalgia and that she experienced chronic pain, but that there was substantial evidence in the record to support the ALJ's determination that Plaintiff could perform light work, specifically the extent of her daily living activities, that medical records indicate that some medication helped her symptoms, and that at one point a treating physician, Dr. Nahra, stated that she was in "no acute distress.[6]"

As further support, the Commissioner cited, at the hearing before this Court, three decisions where a court distinguished Johnson and affirmed an ALJ's decision that an applicant with fibromyalgia was not disabled. However, those cases are distinguishable from Plaintiff's case. In both Keane v. Astrue, No. 09-633A (D.R.I. October 21, 2010) and David v. Astrue, No. 10-314M (D.R.I. June 17, 2011), the RFCs performed by state agency consultants specifically took into consideration the diagnosis of fibromyalgia. Accordingly, the court found that the cases were unlike Johnson because the ALJ's decisions did not rest on "flawed" RFCs that either did not mention fibromyalgia as a diagnosis or focused on a lack of objective findings. Keane, No. 09-633a, slip op. at 16; David, No. 10-314M, slip op. at 17. As discussed supra, such issues are found in this case – the ALJ gave little weight to Dr. Epstein's RFC because of a lack of

---

[6] Dr. Nahra made this statement, however, before Plaintiff's diagnosis of fibromyalgia. (AR 415-16).

objective evidence and gave greater weight to RFCs of non-examining physicians that were completed before Plaintiff's diagnosis of fibromyalgia. Vargas v. Astrue[7], No. 10-10508 (D. Mass. June 27, 2011), is also distinguishable. In Vargas, a rheumatologist examined the applicant on several occasions and found that her claims of pain were "psychosomatic." Vargas, No. 10-10508, slip op. at 20, 22. Here, none of Plaintiff's physicians have discredited her complaints of pain. In addition, in Vargas, the ALJ relied on other treating physicians' notes and findings to support his conclusion.

The ALJ's decision regarding the Plaintiff's subjective symptoms was based on a faulty legal analysis. On remand, the Commissioner should consider its assessment of Plaintiff's credibility in light of Johnson.

4.      *Vocational Testimony*

Plaintiff also challenges the ALJ's adoption of the VE's testimony that there are jobs that exist in significant numbers in the national economy that the Plaintiff could perform. (Pl.'s Br. 20-22). The ALJ's adoption of the VE's opinion was error because the hypothetical posed by the ALJ to the VE was based on, as discussed supra, the ALJ's erroneous rejection of Dr. Epstein's RFC and the claimant's subjective symptoms (AR 59). Indeed, when the Plaintiff's attorney questioned the VE based on Dr. Epstein's RFC, the VE testified that those considerations would exclude the jobs he stated that Plaintiff could perform. (AR 30-34). Accordingly, on remand the Commissioner should also consider whether Johnson has any bearing on the evaluation of the VE's testimony.

---

[7] The District Court has not adopted yet the Vargas Report and Recommendation. The Report and Recommendation was entered on June 27, 2011, and objections were filed on July 11, 2011.

5. *Obligation to Re-Contact Dr. Epstein*

Plaintiff argues that the ALJ erred by not re-contacting Dr. Epstein to resolve inconsistencies or ambiguities in the evidence. (Pl.'s Br. 13). An ALJ is required to re-contact a treating physician to seek additional evidence or clarification when his report contains a conflict or ambiguity that must be resolved. Anderson v. Astrue, 682 F. Supp. 2d 89, 96 (D. Mass. 2010); 20 CFR § 404.1512(e); § 404.1527(c)(3); SSR 96-5p, 1996 SSR LEXIS 2. In other words, an ALJ is only required to re-contact a treating physician when the ALJ is unable to discover the evidentiary basis for a treating source's opinion. Conte v. McMahon, 472 F. Supp. 2d. 39, 49 (D. Mass. 2007).

Here the ALJ did not fail to understand Dr. Epstein's RFC assessment or its foundation – she found that it was inconsistent with the record, albeit on the erroneous basis that it was inconsistent with the objective medical evidence. In any event, because this Court recommends that the case be remanded for findings consistent with Johnson, this argument by Plaintiff is largely moot.

**IV. CONCLUSION**

For the foregoing reasons, I recommend that the Court DENY the Commissioner's Motion to Affirm [Docket No. 11], and REMAND the case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further findings and/or proceedings not inconsistent with this report and recommendation.

**V. REVIEW BY DISTRICT JUDGE**

The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72(b), any party who objects to these proposed findings and recommendations must file specific written

objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Fed. R. Civ. P. 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Phinney v. Wentworth Douglas Hospital,199 F.3d 1 (1st Cir. 1999); Sunview Condo. Ass'n v. Flexel Int'l, 116 F.3d 962 (1st Cir. 1997); Pagano v. Frank, 983 F.2d 343 (1st Cir.1993).

                                                   /s/ Jennifer C. Boal
                                                   JENNIFER C. BOAL
                                                   United States Magistrate Judge